Filed 7/26/17; on remand

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| CROSSROADS INVESTORS, L.P., | C072585 |
| Plaintiff and Respondent, | (Super. Ct. No. CV CV 12-1067) |
| v. | OPINION ON REMAND |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, Daniel P. Maguire, Judge. Reversed with directions.

Buchalter Nemer, Buchalter, Jeffrey S. Wruble, Efrat M. Cogan, and Oren Bitan for Defendant and Appellant.

Law Offices of Melinda Jane Steuer and Melinda Jane Steuer for Plaintiff and Respondent.

1

This appeal challenges the trial court's denial of defendant's special motion to strike the complaint under Code of Civil Procedure section 425.16, otherwise known as the anti-SLAPP statute.[1] Defendant Federal National Mortgage Association (Fannie Mae) initiated nonjudicial foreclosure proceedings against property owned by plaintiff Crossroads Investors, L.P. (Crossroads), but Crossroads filed for bankruptcy protection, staying the proceedings. Its proposed reorganization plan called for selling the property to a third party, who would reinstate the loan but on different material terms less favorable to Fannie Mae. Fannie Mae would not be paid what it was owed in full. The bankruptcy court called the plan "dubious," and Crossroads' counsel agreed they were "trying to have our cake and eat it too."

Crossroads alleges while the bankruptcy stay was in effect and afterwards, it requested accountings from Fannie Mae under Civil Code section 2924c to learn the amount required to reinstate or pay off the defaulted loan. It also tendered performance both to reinstate and pay off the loan as authorized under Civil Code section 2924c. Fannie Mae did not respond to the requests for accountings except in response to an interrogatory served on it as part of the bankruptcy action. It also refused to accept the tenders.

Crossroads failed to obtain confirmation of a reorganization plan, and the bankruptcy court granted Fannie Mae relief from the stay. Crossroads alleges Fannie Mae promised in a telephone conversation with Crossroads' counsel to notify Crossroads of the date it intended to sell the property. Fannie Mae shortly thereafter sold the property, and it did so without providing prior notice to Crossroads.

Crossroads filed this action against Fannie Mae for wrongful foreclosure, breach of contract, fraud, and other tort and contract causes of action. Fannie Mae filed an anti-

_____

[1] "SLAPP" is an acronym for strategic lawsuit against public participation.

2

SLAPP motion, contending the actions on which Crossroads based its complaint arose from the exercise of its constitutional rights of speech and petition; specifically, statements and omissions made in, or concerning issues under review in, the bankruptcy action. It also argued Crossroads could not establish a prima facie case in support of its claims. The trial court disagreed and denied the motion. In an earlier opinion, we affirmed the trial court's order.

The California Supreme Court granted Fannie Mae's petition for review, depublished our original opinion, and transferred the matter to us to reconsider the appeal in light of *Baral v. Schnitt* (2016) 1 Cal.5th 376 (*Baral*). The parties have filed supplemental briefs which we have considered.

We now reverse the trial court's ruling and direct it to grant the anti-SLAPP motion. Except for claims based on one of Fannie Mae's actions discussed below, all of Crossroads' claims arose from Fannie Mae's constitutionally protected actions that were taken as part of, or related to, the bankruptcy action. Further, Crossroads did not establish a prima facie case in support of those claims, as all of its tort claims based on protected activity attacked statements privileged under Civil Code section 47, and its contract claims arising from protected activity were barred as a matter of law.

FACTS

In 2005, Crossroads borrowed $9 million subject to a promissory note. The note was secured by a deed of trust recorded against an apartment building Crossroads owned in Woodland. Fannie Mae became the beneficiary of the deed.

The note imposed on Crossroads a prepayment premium (sometimes referred to as yield maintenance or a prepayment penalty) should Crossroads pay the unpaid principal before the note's maturity date or should Crossroads default and Fannie Mae accelerate the loan.

Crossroads defaulted on the note in late 2010. Fannie Mae served Crossroads with a notice of default, and it accelerated the loan. On February 1, 2011, Fannie Mae

3

initiated nonjudicial foreclosure proceedings by recording the notice of default against the property. The notice stated Crossroads could reinstate the loan by paying all past due payments plus costs and expenses permitted by statute. It informed Crossroads that as of December 30, 2010, that amount was $286,900.10.

As required by Civil Code section 2924c (section 2924c), the notice of default informed Crossroads it could reinstate the loan by tendering the amount it owed to bring its payments current no later than five business days before the date Fannie Mae intended to sell the property. It informed Crossroads that after the expiration of that time period, the only way to stop the foreclosure was to pay off the loan before the sale occurred. It also informed Crossroads it could learn how much it owed either by submitting a written request for a written itemization or by contacting Fannie Mae's trustee. It provided the trustee's address and phone number.

In addition to recording the notice of default, Fannie Mae instituted state court litigation against Crossroads and secured a receiver to take control of the property.

On April 15, 2011, Crossroads entered into a contract to sell the property to Ezralow Company, LLC (Ezralow) for $10.95 million. On May 9, 2011, Crossroads and Ezralow proposed to Fannie Mae that Ezralow would assume Crossroads' obligations and pay off the loan on condition Fannie Mae agreed to waive the prepayment premium. Fannie Mae refused to waive the premium, and it rejected the proposal.

Fannie Mae recorded a notice of trustee's sale against the property on June 24, 2011. The notice stated the property would be sold on July 19, 2011. It also stated the total unpaid amount of Crossroads' obligations and reasonable estimated costs, expenses and advances as of the notice's date was estimated to be $10,525,126.40. The notice stated prepayment premiums, accrued interest and advances "will increase this figure" prior to the sale, and it provided a Web site address and telephone number for Crossroads to use to obtain updated sale information.

4

On July 18, 2011, the day before the property was scheduled to be sold, Crossroads filed for Chapter 11 bankruptcy protection. It did so in part "to restructure the Loan so that it can consummate the sale of the Property to [Ezralow] and assumption of the Loan by [Ezralow]." In its petition, Crossroads asserted it owed Fannie Mae approximately $8.7 million. When Crossroads declared bankruptcy, the state court action was stayed but not dismissed. (11 U.S.C. § 362.)

On the following day, July 19, Crossroads entered into an amended and restated contract to sell the property to Ezralow for $10.95 million. This agreement conditioned the sale on the filing by Crossroads of a Chapter 11 bankruptcy proceeding, which it had, and on Crossroads seeking, and the bankruptcy court approving, a reorganization plan under which Ezralow would assume and reinstate the loan, and the loan's terms would be restructured to eliminate the prepayment premium and vary the interest rate and the maturity date. The agreement required Ezralow to approve the proposed reorganization plan before Crossroads submitted it to the court. If Ezralow disapproved the proposed plan, the agreement was automatically terminated. Also, Ezralow could terminate the agreement and cancel escrow if the bankruptcy court did not approve eliminating the prepayment premium as part of the reorganization plan.

Crossroads filed its first disclosure statement and proposed reorganization plan with the bankruptcy court, and it based its plan on the terms of the July 19, 2011 sale agreement with Ezralow.[2] Crossroads' proposed plan asked the court to approve the sale to Ezralow for $10.95 million, but it also proposed eliminating the prepayment premium.

---

[2]  In bankruptcy proceedings, a disclosure statement provides detailed information regarding a proposed reorganization plan. The plan proponent prepares the statement. The bankruptcy court must approve the statement before it may be sent to all creditors and parties in interest along with the reorganization plan. (11 U.S.C. § 1125(b).) " 'The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan.' [Citation.]" (*In re Diversified Investors Fund XVII* (Bankr. C.D.Cal. 1988) 91 B.R. 559, 561.)

The bankruptcy court rejected Crossroads' first disclosure statement in part because it failed to acknowledge Fannie Mae's full claim.

Fannie Mae filed a proof of claim in the bankruptcy action for $10,447,090.43. The claim included $1,590,616.61 for the prepayment premium. Crossroads objected to the claim, contending, among other things, the prepayment premium was an unreasonable liquidated damages provision unenforceable under Civil Code section 1671.[3] At a hearing on February 6, 2012, the bankruptcy court disagreed and overruled Crossroads' objection. It ruled the prepayment premium was enforceable under California law, and Fannie Mae could claim it in the bankruptcy proceeding.[4]

On the same day it ruled Fannie Mae was entitled to claim the prepayment premium, the bankruptcy court conditionally granted Fannie Mae relief from the bankruptcy stay. The court had disapproved Crossroads' first disclosure statement, and Crossroads had made no effort to prosecute plan confirmation until only recently when it filed a second statement. The court granted Fannie Mae relief from the stay to be effective three months later on May 15, 2012, provided Crossroads had not obtained confirmation of its reorganization plan by that date.

---

[3] We grant Fannie Mae's request for judicial notice of Crossroads' objection to the claim. (Evid. Code, § 452, subd. (d).)

[4] The bankruptcy court ruled prepayment premiums triggered by the debtor's default are enforceable under California law if the prepayment is voluntary. (See *In re Imperial Coronado Partners, Ltd.* (Bankr. 9th Cir. 1989) 96 B.R. 997.) The payment is not voluntary if, as of the date the debtor petitioned for bankruptcy, the debtor was in a position where it had to pay the accelerated loan or lose the property. However, the payment is voluntary if the debtor, as of the petition date, could either reinstate the loan under state law or decelerate the loan under bankruptcy law. The court noted that neither Crossroads nor Fannie Mae briefed Crossroads' right under state law to reinstate the loan on the petition date, but it ruled the prepayment premium was voluntary, and thus enforceable under California law, and Fannie Mae could claim it because Crossroads could decelerate the loan under bankruptcy law as part of its reorganization plan.

6

After the bankruptcy court rejected Crossroads' objection to the prepayment premium, Crossroads served an interrogatory in the bankruptcy action on Fannie Mae that asked for the amount required "under state law" to cure the loan as of June 1, 2012. Fannie Mae responded by stating it could not provide an accurate response because the interrogatory sought an amount that was contingent upon future events; it would provide a response on June 1, 2012.

At the bankruptcy hearing on its second disclosure statement, Crossroads contended its July 19, 2011 sale agreement with Ezralow was still the operating agreement for purposes of its reorganization plan. It asked the court to rule on whether its plan under that agreement to eliminate the prepayment premium and decelerate the loan had a chance of being accepted. The court called the Ezralow agreement "dubious." It explained: "You are trying to have your cake and eat it too. You are trying to sell this to somebody else and avoid calling it a sale to somebody else, right? That is what is going on here. [¶] I mean, your client—this debtor is going to retain a small piece and is going to sell it to someone else, and the reason your client is holding on to a small piece is you are trying to avoid calling it a sale so you don't have to do a sale clause or acceleration clause or whatever."

Crossroads' counsel agreed with the court's summary, saying, "We are trying to have our cake and eat it too." The court said it lacked sufficient information to declare at that point in time whether Crossroads' proposed plan could be confirmed. The court disapproved the second disclosure statement and granted Crossroads time to file an amended statement. The following month, the court rejected Crossroads' third disclosure statement.

Ezralow's senior vice president stated in a declaration that Ezralow was committed to purchasing the property and reinstating or paying off the loan in full, including prepayment penalties, if necessary. Ezralow had the financial wherewithal to do so.

7

Similarly, Crossroads' bankruptcy counsel, Kenrick Young, stated in a declaration that while the bankruptcy action was pending from July 2011 to May 2012, Crossroads informed Fannie Mae many times it was ready, willing, and able to cure the default or pay off the loan upon being provided the amount necessary to do so. Crossroads had the ability to fulfill its tender offers because Ezralow had agreed to pay those funds on its behalf. Although it opposed the prepayment premium, Crossroads informed Fannie Mae that if the bankruptcy court determined Fannie Mae was entitled to the prepayment premium, Crossroads would pay Fannie Mae's claim in full because the contracted sales price was sufficient to pay it. Young did not specify when or where Crossroads relayed this information to Fannie Mae.

Young also stated in his declaration that while the bankruptcy action was pending, Crossroads asked Fannie Mae many times to provide the amount required to cure the default or pay off the loan. Crossroads alleges in its verified complaint that Fannie Mae refused to accept Crossroads' tenders and provided no response to Crossroads' requests for an accounting. Young did not specify when or where Crossroads made these requests or Fannie Mae refused to accept tender.

In April 2012, Crossroads filed its fourth disclosure statement, which the court conditionally approved.[5] Crossroads also filed a motion to continue the stay.

While the motion to continue the stay was pending, Young e-mailed a settlement offer to Fannie Mae's attorney, Anthony Napolitano, on May 2, 2012. Crossroads offered to pay Fannie Mae $9 million to compromise Fannie Mae's bankruptcy claim. Fannie Mae rejected the offer.

The bankruptcy court heard the motion to continue the stay on May 14, 2012, and took the matter under submission. After the hearing, Young asked Napolitano if

---

[5] By then, Fannie Mae had filed an amended claim for $10,335,603.15, which included the prepayment premium of $1,590,616.61.

Crossroads would still be willing to entertain a settlement offer. He also asked if Fannie Mae would notify him if it intended to foreclose on the property. Napolitano told Young he wanted to wait for the court's ruling on the motion to continue the stay before engaging in any further discussions.

The bankruptcy court denied the motion to continue the stay. It had given Crossroads ample time to obtain a confirmed reorganization plan, and it was apparent Crossroads' proposed plan was "likely unconfirmable." Despite the court's previous approval of Fannie Mae's claim for the prepayment premium, Crossroads was still seeking to sell the property to Ezralow as part of its reorganization without providing for payment of the premium. The bankruptcy court found no legal way for Crossroads to accomplish its objective through bankruptcy, and thus concluded Crossroads' plan did not have a reasonable possibility of being confirmed within a reasonable time.[6]

Fannie Mae's relief from the bankruptcy stay became effective on May 15, 2012, as Crossroads had not obtained an approved reorganization plan by that date.

On May 17, 2012, Young spoke with Napolitano by telephone. The two attorneys remembered the call differently, but for our purposes, we assume the truth of Young's testimony where there is conflict. Young asked if Fannie Mae would be willing to hold off on foreclosing and support a sale to Ezralow under a provision of the Bankruptcy Code. Fannie Mae would be paid the full amount of its claim, but the sale would not close for two months. Young asked for a payoff amount to pay the loan in full. Young

---

[6] According to the bankruptcy court, there were only two options under bankruptcy law for Crossroads to obtain plan confirmation without Fannie Mae's consent: it could reinstate (or decelerate) the loan as part of its reorganization plan, or it could "cram down" on (i.e., modify the terms of) the secured claim if the claim qualified for that treatment under bankruptcy law. The court found Crossroads, by still seeking to sell the property subject to the lien but without the prepayment premium, was not attempting to reinstate the loan, and the transaction as structured could not legally qualify as a cram down.

9

also asked Napolitano if he would agree to notify Crossroads of any scheduled sale date by a reasonable time prior to its occurrence. Young stated in his declaration that Napolitano agreed to provide notice of a sale.

Later that day, Napolitano by e-mail asked to inspect the property. Young responded by e-mail that Crossroads wished to sell the property to Ezralow and pay Fannie Mae. He asked if Fannie Mae would agree to a consensual sale of the property to Ezralow on condition Fannie May received the amount it claimed in its amended bankruptcy claim. Young said Crossroads was looking at a July or early August 2012 close of escrow. Crossroads alleged Napolitano did not respond to this e-mail.

Young contacted Napolitano by telephone on May 22, 2012. He asked Napolitano to provide him with the amount required to cure the default. He also proposed that Crossroads would dismiss its bankruptcy action to allow for a faster sale to Ezralow and payment in full to Fannie Mae. He stated Crossroads was ready, willing, and able to cure the default or pay Fannie Mae in full upon receiving the amount of its demand. Napolitano stated that in this call, Young also asked him to confirm in writing that Fannie Mae would give him notice before foreclosing. Napolitano told Young he could not provide him with the confirmation but he would relay Young's request for a reinstatement quote to Fannie Mae and get back to him.

On May 24, 2012, the trustee sold the apartment complex at a nonjudicial foreclosure sale. The sale took Crossroads by surprise. Young believed Napolitano would have honored his promise to notify him of any scheduled sale prior to the sale date.

Crossroads objected to the trustee's sale and asked the trustee to set it aside and not record a new deed. It also dismissed its bankruptcy action in June 2012. It filed this action against Fannie Mae and the trustee and recorded a lis pendens. However, the trustee recorded a trustee's deed upon sale.

10

PROCEDURAL HISTORY

Crossroads' first amended complaint alleges seven causes of action against Fannie Mae: wrongful foreclosure, breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, fraud, promissory estoppel, and intentional interference with a contractual relationship.[7] It seeks to rescind the trustee's sale and to recover damages. Crossroads alleges the conduct by Fannie Mae from which all of its causes of action arise consists of: (1) Fannie Mae's repeated failure to provide, in response to Crossroads' requests and its interrogatory, a timely and accurate accounting of the amount needed to reinstate the loan or pay the loan in full, in violation of section 2924c; (2) its refusal to accept Crossroads' tenders of the amount required to cure the default or pay the loan in full, in violation of section 2924c; and (3) its falsely stating it would provide Crossroads with advance notice of a trustee's sale, and its actual failure to provide that notice.

Fannie Mae filed an anti-SLAPP motion and a demurrer against the complaint. The trial court denied the motion. It ruled Fannie Mae had not shown Crossroads' action arose from Fannie Mae's protected activity. The court wrote: "The gravamen of plaintiff's first amended complaint is its contention that defendant wrongfully foreclosed upon the subject property in an illegally conducted non-judicial foreclosure." The court also overruled the demurrer.

DISCUSSION

Fannie Mae contends the trial court erred when it denied its anti-SLAPP motion. It argues it submitted sufficient evidence to establish that Crossroads was suing based on Fannie Mae's protected activities, and that Crossroads failed to show it was likely to

---

[7] The complaint also named as defendants the trustee, Fidelity National Title, Inc., and the purchasers of the apartment complex, JCM Properties, LLC, and Daylight Assets II, LLC. These additional parties and the allegations against them are not before us.

11

succeed on the merits. We agree, except with regard to any claims arising from Fannie Mae's rejection of the May 2011 settlement proposed by Crossroads and Ezralow. Those claims did not arise from protected activity.

I

*Scope and Standard of Review*

A.     *Law of the case doctrine*

Before proceeding, we must address an issue Crossroads raises about our scope of review. Crossroads contends our current review is subject to the law of the case doctrine. It argues our prior opinion continues to be the law of this case on all points it decided except the issues impacted by *Baral*, and that the scope of our current review is limited accordingly. We disagree. The law of the case doctrine does not apply in this instance because our prior opinion was never a final judgment and is no longer considered to exist.

" ' "The doctrine of the law of the case is this: That where, upon an appeal, the [reviewing] court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular." ' " (*People v. Stanley* (1995) 10 Cal.4th 764, 786, quoting *People v. Shuey* (1975) 13 Cal.3d 835, 841 (*Shuey*).)

The law of the case doctrine applies only if the prior decision became a final judgment. It is the fact the decision became final that renders it the law of the case on a retrial and a subsequent appeal from the retrial. As a result of the Supreme Court's grant of review, however, our prior opinion never became final and it no longer exists as a judgment in this case. When the high court granted review and transferred the case to us, "our decision and the opinion filed by us became a nullity. [Citations.] . . . [T]he matter

12

is now before us again on all issues as if it had never been decided." (*Gillaizeau v. Bank of America* (1986) 179 Cal.App.3d 836, 839.)

"[I]t is a well-established principle of law that a grant of review by the Supreme Court nullifies the opinion and causes it to no longer exist. (*Knouse v. Nimocks* (1937) 8 Cal.2d 482, 483-484; *People v. Ford* (1981) 30 Cal.3d 209, 215-216.) In *Knouse v. Nimocks,* the Supreme Court granted review because the record showed that a justice who wrote the opinion in the Court of Appeal had ruled upon the case's demurrer in the trial court, and was therefore disqualified from participating in the appeal. (*Knouse v. Nimocks, supra,* at p. 483.) The Supreme Court stated, 'Just what effect this disqualification . . . might have had upon the decision of the District Court of Appeal, had we not granted a transfer of said cause, is now a matter of no consequence. The opinion and decision of the District Court of Appeal, by our order of transfer, have become a nullity and are of no force or effect, either *as a judgment* or as an authoritative statement of any principle of law therein discussed.' (*Id*. at pp. 483-484.) Without some further act of approval or adoption by the Supreme Court, the opinion and decision were 'of no more effect *as a judgment* or as a precedent to be followed in the decision of legal questions that may hereafter arise than if they had not been written.' (*Id.* at p. 484.) Though a depublished opinion, *unlike an opinion for which review was granted*, still governs the dispute between the parties involved, the effect is the same for the purposes of precedential value: depublication nullifies the opinion as precedent and it is as if the opinion had not been written." (*Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 109-110, italics added, fn. omitted.)

By depublishing our prior opinion, the Supreme Court nullified the opinion as precedent outside of this case. And by granting review of the prior opinion, the high court nullified it as any kind of judgment or precedent binding on the parties to this case or on us. It is as if we never wrote that opinion.

13

Crossroads relies on *Romo v. Ford Motor Co.* (2003) 113 Cal.App.4th 738 (*Romo*), to contend the law of the case doctrine applies here. *Romo* does not persuade us. In that case, the Court of Appeal in its original opinion addressed and rejected numerous issues raised by the defendant concerning the award of compensatory damages and punitive damages in a wrongful death judgment. All of the issues on appeal involved state law except one; a federal due process challenge to the amount of punitive damages. (See *Romo v. Ford Motor Co.* (2002) 122 Cal.Rptr.2d 139, cert. granted and judgment vacated by *Ford Motor Co. v. Romo* (2003) 538 U.S. 1028 [155 L.Ed.2d 1056].) After the California Supreme Court denied review, the defendant filed a petition for certiorari in the United States Supreme Court. That court granted the petition, vacated the judgment, and remanded the matter to the Court of Appeal for further consideration in light of a recent opinion the high court had filed. (*Ibid.*) The recent authority established a federal due process limitation on the measure of punitive damages. (*Romo, supra,* 113 Cal.App.4th at p. 749.)

On remand, the Court of Appeal applied the new authority to its de novo review of the punitive damage award. However, it concluded the law of the case doctrine barred it from reconsidering any other aspect of its prior opinion. The appellate court wrote: "Although the judgment in this case was vacated by order of the United States Supreme Court, that action affected only limited—albeit important—portions of the case. Our original opinion, except for the section of the discussion entitled 'Review Under Federal Constitution' . . . , was not affected by the Supreme Court's action: the decision retains the ordinary precedential value of a published opinion of an intermediate appellate court and it remains the law of the case on all points other than the federal constitutional issue. (See generally [*Shuey, supra,*] 13 Cal.3d [at p.] 841; *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 309 [*Yu*].)" (*Romo, supra,* 113 Cal.App.4th at p. 744, fn. 1.)

*Romo* does not apply here. It concerned the grant of certiorari by the United States Supreme Court, not the grant of review by the California Supreme Court. The federal

14

high court's jurisdiction over final state court judgments is limited to those judgments that concern the validity of a federal treaty or statute, the validity of a state statute under federal law, or a claim arising under federal law. (28 U.S.C. § 1257(a).) Those portions of its prior opinion the *Romo* court found subject to the law of the case doctrine were not subject to the United States Supreme Court's jurisdiction.

Here, by contrast, the California Supreme Court had jurisdiction on review to address all of the issues raised in our prior opinion, and it granted review of that opinion without limiting the issues it would consider. Having done so and transferred the matter to us without limitation, we now proceed on a clean slate.

B.      *Standard of review*

The anti-SLAPP statute provides a "procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055-1056.) Consequently, "the anti-SLAPP statute is to be construed broadly." (*Padres L.P. v. Henderson* (2003) 114 Cal.App.4th 495, 508.)

We review the trial court's ruling de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) We consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (Code Civ. Proc., § 425.16, subd. (b)(2).)

We evaluate an anti-SLAPP motion using a two-step process. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon Enterprises*).) We first determine "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).) A defendant meets this burden by showing the plaintiff's claim arises from acts the defendant took "in furtherance of the right of petition

15

or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (Code Civ. Proc., § 425.16, subd. (b)(1).)[8]

As relevant here, the anti SLAPP statute defines an "act in furtherance of a person's right of petition or free speech" to include: "(1) any written or oral statement or writing made before a . . . judicial proceeding . . . , [and] (2) any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body . . . ." (Code Civ. Proc., § 425.16, subd. (e)(1), (2).)

In deciding whether a cause of action arises from protected activity, "the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*City of Cotati*), original italics.) There is "a distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1064 (*Park*).) To be subject to the anti-SLAPP statute, "the prior protected activity [must] supply elements of the challenged claim." (*Ibid.*) "[A] claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Id.* at p. 1060, original italics.)

---

**8**      When the SLAPP statute refers to a "cause of action," it is not referring specifically to a pleaded cause of action or a primary right. Rather, it refers to "*allegations of protected activity that are asserted as grounds for relief.* The targeted claim must amount to a 'cause of action' in the sense that it is alleged to justify a remedy. By referring to a 'cause of action against a person arising from *any act* of that person in furtherance of' the protected rights of petition and speech, the Legislature indicated that *particular* alleged acts giving rise to a claim for relief may be the object of an anti-SLAPP motion. ([Code Civ. Proc.,] § 425.16[, subd.] (b)(1), italics added.) . . . Neither the form of the complaint nor the primary right at stake is determinative." (*Baral, supra,* 1 Cal.5th at p. 395, original italics.)

When we take this first step and determine whether the plaintiff's claims arise from defendant's protected activity, we do not consider the legitimacy of the plaintiff's claims. (*City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 371.)

"[T]he moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage." (*Baral, supra,* 1 Cal.5th at p. 396.) If the defendant fails to establish the plaintiff's claim is based on defendant's protected activity, then the claim survives and is not subject to the anti-SLAPP statute. (*Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1550.)

If the court determines relief is sought based on allegations arising from activity protected by the statute, it proceeds to the second step. At this step, "the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. We have described this second step as a 'summary-judgment-like procedure.' [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.]" (*Baral, supra,* 1 Cal.5th at pp. 384-385, fn. omitted.) Plaintiff must "demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. . . . If [it is] not, the claim is stricken. Allegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing." (*Id.* at p. 396.)

"Only a [claim] that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP,

subject to being stricken under the statute." (*Navellier, supra,* 29 Cal.4th at p. 89, original italics.)

## II

### *First Prong: Claims Arising from Protected Activity*

We begin with the first step. As mentioned, the parties agree Crossroads' claims against Fannie Mae arose from the following alleged actions:

(1) Fannie Mae's failure to provide, in response to Crossroads' requests, a timely and accurate accounting of the amount needed to reinstate the loan or pay the loan in full, in violation of section 2924c;

(2) Fannie Mae's refusal to accept Crossroads' tenders of the amount required to cure the default or pay the loan in full, in violation of section 2924c; and

(3) Fannie Mae's falsely stating after being relieved from the bankruptcy stay it would provide Crossroads with advance notice of a trustee's sale, and its failure to provide that notice.

We review each action to determine if it was an exercise by Fannie Mae of speech or petition rights protected under the anti-SLAPP statute. We conclude the actions in all instances but one were protected activity.

A.      *Responses to requests for accountings*

A debtor on a loan secured by a deed of trust on real property has at least two ways under state law to prevent a foreclosure sale. He may either reinstate, or cure, the loan by bringing his payments current no later than five business days before the scheduled sale (§ 2924c, subds. (a)(1), (e)), or he may redeem, or pay off, the loan by paying off the entire amount owed before the sale occurs. (Civ. Code, §§ 2903, 2905.)

Section 2924c requires a recorded notice of default to inform the debtor that he may obtain the amount required to pay off or reinstate the loan by communicating with the lender or beneficiary. He may make a written request to the lender for a written itemization of the entire amount required to pay off the loan, or, to find out either the pay

18

off amount or the amount required to stop the foreclosure, he may simply contact the lender. The notice provides the lender's mailing address and telephone number. (§ 2924c, subd. (b)(1).)

Crossroads contends it requested, orally and by the interrogatory, the amounts necessary for it to reinstate and redeem the loan. The interrogatory was made in the bankruptcy action, and the oral requests were made while the bankruptcy action was pending both before and after relief from the stay was granted. Crossroads claims Fannie Mae responded only to the interrogatory, and its response did not provide the requested information. It alleges Fannie Mae's response to the interrogatory and lack of responses to all of its oral requests violated section 2924c. In opposition to the anti-SLAPP motion, Crossroads contends Fannie Mae's responses were not protected activity.

Fannie Mae contends its responses to the requests were protected activity because (1) its response to the interrogatory was a "writing made" in the bankruptcy action; and (2) its omissions were "made in connection with an issue under consideration or review by" the bankruptcy court. (Code Civ. Proc., § 425.16, subd. (e)(1), (2).) We agree with Fannie Mae.

Had Crossroads made its requests when no bankruptcy action was pending, our analysis would be short. The anti-SLAPP statute does not apply to claims of wrongful foreclosure arising from actions taken in a nonjudicial foreclosure proceeding. Such proceedings are not judicial or official proceedings under the anti-SLAPP statute, and a creditor's pursuit of a nonjudicial foreclosure and compliance with its statutory procedures do not involve the exercise of protected speech or petitioning activity. (*Garretson v. Post* (2007) 156 Cal.App.4th 1508, 1520-1525.) Crossroads, however, filed for bankruptcy. In this case, that makes all the difference.

1. *Interrogatory response*

We have no difficulty concluding Fannie Mae's response to the interrogatory was protected. (Code Civ. Proc., §425.16, subd. (e)(1).) The response was a writing made in

19

the bankruptcy action and directed to persons who had an interest in that proceeding. (See *Contemporary Services Corp. v. Staff Pro Inc.* (2007) 152 Cal.App.4th 1043, 1055.)

2. *Responses during bankruptcy action before stay was lifted*

We also conclude Fannie Mae's omissions to respond to the requests made while the bankruptcy action was pending and prior to Fannie Mae being relieved from the stay were protected activity because they were made in connection with issues under review in the bankruptcy proceeding.[9] "A statement is 'in connection with' an issue under consideration by a court in a judicial proceeding within the meaning of clause (2) of [Code of Civil Procedure] section 425.16, subdivision (e) if it *relates to* a substantive issue in the proceeding and is directed to a person having some interest in the proceeding.

---

[9] In our prior opinion, we concluded the claims for failure to provide an accounting outside of the interrogatory did not arise from protected activity in part because they challenged nonexpressive conduct, and we ruled a defendant's silence was not protected conduct under the express language of the anti-SLAPP statute. Since then, Division 4 of the Second District Court of Appeal concluded the anti-SLAPP statute applies to omissions and concealments made in litigation or settlement. (*Suarez v. Trigg Laboratories, Inc.* (2016) 3 Cal.App.5th 118.) Relying on Supreme Court precedent, the court stated: "In *Navellier, supra,* 29 Cal.4th at page 89, anti-SLAPP protection was applied to an action alleging 'misrepresentations and omissions' in connection with the signing of a release in an underlying federal action. Defendant allegedly failed to disclose that he was secretly not in agreement with the terms of the release, which induced plaintiffs to file an amended federal action; defendant then claimed he did not release, and did not intend to release his claims. The Supreme Court found that each of defendant's 'acts or (omissions) . . . falls squarely within the plain language of the anti-SLAPP statute.' (*Id*. at p. 90.) Misrepresentation or failure to disclose can be protected petitioning activity for purposes of [Code of Civil Procedure] section 425.16.

"This is consistent with established free speech jurisprudence. The right to freedom of speech under the First Amendment to the United States Constitution and under article I, section 2 of the California Constitution, encompasses what a speaker chooses to say, and what a speaker chooses not to say; it is a right to speak freely and also a right to refrain from doing so at all. (*Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 342; *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 491.)" (*Suarez v. Trigg Laboratories, Inc, supra,* 3 Cal.App.5th at pp. 123-124.) We agree.

[Citation.]" (*Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1167, italics added.)

Both the payoff and cure amounts were substantial issues in the bankruptcy action, and it was Crossroads that placed them at issue. Crossroads put the payoff amount at issue by challenging the prepayment premium's validity under California law when it objected to Fannie Mae's proof of claim. Crossroads contended in the bankruptcy action the prepayment premium was an unreasonable liquidated damages provision unenforceable under Civil Code section 1671. With this objection, Crossroads in effect asked the bankruptcy court to determine the payoff amount allowed under California law. Indeed, in its objection to Fannie Mae's proof of claim, Crossroads argued to the bankruptcy court that "[a]n early determination of the amount of the Fannie Mae debt is essential because the Debtor has already entered into a purchase [and] sale agreement . . . ."

The bankruptcy court considered and resolved the legality of the prepayment premium in favor of Fannie Mae while Crossroads outside the court sought the payoff information from Fannie Mae. Fannie Mae chose not to provide to Crossroads outside the court the information Crossroads sought until after the court resolved Crossroads' objection. Crossroads' claim here based on its requests for the payoff amount thus concerned Fannie Mae's exercise of its speech and petition rights in connection with an issue that was under consideration in the bankruptcy court at Crossroads' request.

The cure amount also became a substantial issue in the bankruptcy proceeding. In its objection to Fannie Mae's proof of claim, Crossroads argued the default interest and late fees charged under the note upon a default were unlawful penalty and punitive damages provisions under Civil Code section 1671. Moreover, each of Crossroads' proposed reorganization plans called for reinstating the loan, contingent on the court eliminating the prepayment premium. Thus, at the time Crossroads asked Fannie Mae for the cure amount, it was litigating in bankruptcy court what that amount could legally be

21

under California law. The out-of-court requests for the accountings and Fannie Mae's failure to respond to them were thus made in connection with issues under consideration by the bankruptcy court.

Crossroads contends its causes of action did not arise from protected activity because its requests, and its tenders, were made outside of the bankruptcy proceeding. It asserts its complaint is based on Fannie Mae's conducting a wrongful nonjudicial foreclosure, not on Fannie Mae's exercise of its petition or speech rights in the bankruptcy action. Crossroads states its complaint does not allege Fannie Mae acted improperly in the bankruptcy action, nor does it allege its proposed reorganization plans constituted the tenders on which it seeks recovery. Rather, Crossroads argues it seeks to recover based on unprotected activity. It claims any statements and omissions Fannie Mae made during the bankruptcy action are at most background information and evidence of noncompliance with section 2924c and are not the activities on which it sued.

We are not persuaded. Crossroads filed bankruptcy to resolve this matter, and now it claims the bankruptcy action was peripheral and irrelevant. To resolve an anti-SLAPP motion, we do not rely on the form of the complaint or the name of a cause of action. Rather, we determine the conduct from which Crossroads' claims arose and whether that conduct was constitutionally protected. Here, the conduct on which Crossroads based its lawsuit is constitutionally protected. It is not just evidence of liability; it actually forms an element of Crossroads' causes of action.

Our Supreme Court very recently discussed the "arising from" element of an anti-SLAPP motion. In *Park, supra,* 2 Cal.5th 1057, the high court ruled an action to recover damages for a university's denial of tenure to an assistant professor due to national origin discrimination was not subject to an anti-SLAPP motion, even though there were numerous communications by the defendants that led up to the challenged decision. Explaining the "arising from" requirement, the court wrote: "A claim arises from protected activity when that activity underlies or forms the basis for the claim. (*City of*

*Cotati*[, *supra,*] 29 Cal.4th [at p.] 78; *Equilon Enterprises,* [*supra,*] 29 Cal.4th at p. 66; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1114.) Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' (*City of Cotati*, at p. 78; accord, *Equilon Enterprises*, at p. 66.) '[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.' (*Navellier* [], *supra*, 29 Cal.4th at p. 89; see *City of Cotati*, at p. 78 [suit may be in 'response to or in retaliation for,' protected activity without necessarily arising from it].) Instead, the focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' (*Navellier*, at p. 92, italics omitted.) 'The only means specified in [Code of Civil Procedure] section 425.16 by which a moving defendant can satisfy the ["arising from"] requirement is to demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in subdivision (e) [of Code of Civil Procedure section 425.16] . . . .' (*Equilon Enterprises*, at p. 66, italics added.) In short, in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by defendant supply those elements and consequently form the basis for liability." (*Park, supra,* 2 Cal.5th at pp. 1062-1063, original italics.)

Thus, for a claim to arise from protected activity for purposes of an anti-SLAPP motion, the actions by the defendant on which the plaintiff bases its lawsuit must qualify as protected activity under Code of Civil Procedure section 425.16, subdivision (e), and must supply an element of plaintiff's claim. If the plaintiff can establish the elements of his claim without relying on the protected activity, the claim does not arise from protected activity. To be subject to the anti-SLAPP statute, the protected activity must "supply elements of the challenged claim." (*Park, supra,* 2 Cal.5th at p. 1064.)

23

Crossroads' contention that Fannie Mae's failures to provide the accountings and accept its tenders are only evidence of its causes of action is incorrect. Fannie Mae's omissions supply the facts necessary to establish an element of its causes of action. For example, the elements of a cause of action for wrongful foreclosure are: " '(1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale (usually but not always the trustor or mortgagor) was prejudiced or harmed; and (3) in cases where the trustor or mortgagor challenges the sale, the trustor or mortgagor tendered the amount of the secured indebtedness or was excused from tendering.' [Citation.]" (*Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 408, quoting *Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 104.)

Fannie Mae's failures to provide the accountings, accept the tenders, and give the promised notice fulfill an element of this tort. They are the acts by which Fannie Mae caused an illegal, fraudulent, or willfully oppressive sale of the property. They are the facts that give rise to Fannie Mae's liability. Without alleging these facts, Crossroads has no cause of action against Fannie Mae under section 2924c.

Because Fannie Mae's omissions to the requests for accounting prior to being relieved from the stay occurred in connection with issues under consideration by the bankruptcy court, as explained above, and form an element of Crossroads' causes of action, they were activities protected under the anti-SLAPP statute.

3.      *Requests after relief from stay granted*

As to Fannie Mae's actions after it was granted relief from the bankruptcy stay, the issues of the amount to reinstate or pay off the loan were no longer being considered by the bankruptcy court. However, the bankruptcy action remained pending, and Crossroads' requests were part of its efforts to settle that matter. Indeed, Crossroads claims that during one of these requests, its attorney proposed that Crossroads would dismiss its bankruptcy action and pay off the loan upon receiving from Fannie Mae the

24

amount of its payoff demand.  Settlement discussions made in connection with litigation are protected activity under the anti-SLAPP statute.  (*Thayer v. Kabateck Brown Kellner LLP* (2012) 207 Cal.App.4th 141, 154.)  Crossroads' claims based on Fannie Mae's responses and omissions to its requests for accountings made after the stay was lifted thus arose from protected activity.

B.      *Responses to tenders*

If the debtor timely pays, or offers to pay, the entire amount due under section 2924c to reinstate the loan or the entire amount due to redeem the loan, the lender must accept the payment or tender.  (Civ. Code, §§ 2924c, subd. (a)(1), 2905.)  Crossroads contends it tendered payment to reinstate or pay off the loan (1) when it proposed on May 9, 2011, to have Ezralow purchase the property according to the first agreement with Ezralow; and (2) while the bankruptcy action was pending and after the stay was lifted by informing Fannie Mae many times it was ready, willing, and able to tender the amount needed to reinstate or pay off the loan.  Crossroads alleges Fannie Mae wrongfully rejected the May 2011 tender and it did not respond to the other tenders.  It claims Fannie Mae's rejections of tender were not protected conduct for purposes of the anti-SLAPP statute.

Fannie Mae argues its refusals to respond to or accept these tenders arose from protected activity because they consisted of settlement discussions made in the bankruptcy action.  (Code Civ. Proc., § 425.16, subd. (e)(1).)  We agree with Fannie Mae.

Fannie Mae's failure to respond to the tenders made during the bankruptcy proceeding and after it was granted relief from the stay were protected activity.  A tender is an unconditional offer to perform an order to extinguish an obligation.  (*Still v. Plaza Marina Commercial Corp.* (1971) 21 Cal.App.3d 378, 385.)  In this matter, an offer to tender performance by paying off the loan would have settled Fannie Mae's proof of claim in the bankruptcy action, and tender of the reinstatement amount would have settled part of Fannie Mae's claim.  Even after relief from the stay was granted, tender up

25

until the time Fannie Mae sold the property would have settled Fannie Mae's proof of claim, as Crossroads did not obtain an approved reorganization plan and did not dismiss the bankruptcy action until after Fannie Mae sold the property. As already stated, an attorney's communication with opposing counsel on behalf of a client regarding settlement of pending litigation "directly implicates the right to petition" and is subject to an anti-SLAPP motion. (*GeneThera, Inc. v. Troy & Gould Professional Corp.* (2009) 171 Cal.App.4th 901, 907-908.)

Because Crossroads' tenders operated as proposed settlements of the bankruptcy claim, Fannie Mae's rejection of those tenders were statements made in a judicial proceeding, and because those rejections form an element of Crossroads' causes of action, they were activities protected under the anti-SLAPP statute.[10]

We also conclude Fannie Mae's rejection on May 9, 2011, of the offer based on the April 15, 2011 agreement between Crossroads and Ezralow was protected activity. Looking back, we can see Crossroads knew it was headed to litigation. More than once, it essentially told the bankruptcy court as much. It was going to do anything it could to stop the nonjudicial foreclosure and change the terms of the contract to avoid paying the prepayment premium. This scheme inevitably lead to the bankruptcy court, where Crossroads sought a judicial order approving its plan not to pay the prepayment penalty. The May 9, 2011 proposal, when seen in this context, was thus an action leading to, and in furtherance of, litigation in the bankruptcy court, and Fannie Mae's rejection of the proposal was related to that litigation. (See *Briggs v. Eden Council for Hope & Opportunity, supra*, 19 Cal.4th at p. 1115 [" 'communications preparatory to or in anticipation of the bringing of an action . . . are equally entitled to the benefits of [Code

---

**10**     Fannie Mae states its state court action was still pending, and its rejection of tender would also be settlement discussions in that action. Fannie Mae has not provided us with any records from that action, so we do not address this argument.

26

of Civil Procedure] section 425.16' "; *Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1268 ["[A]lthough litigation may not have commenced, if a statement 'concern[s] the subject of the dispute' and is made 'in anticipation of litigation "contemplated in good faith and under serious consideration" ' [citation] then the statement may be petitioning activity protected by [Code of Civil Procedure] section 425.16"].)

We are perplexed that Crossroads would assert claims based on Fannie Mae's rejection of the April 2011 agreement. As discussed in more detail below, the May 9 tender was an invalid tender, as it was conditioned on Fannie Mae accepting less than full performance under the contract's terms.

C. *Communications regarding advance notice of the sale*

Crossroads contends its attorney's discussions with Fannie Mae's attorney after relief from the stay was granted, wherein Fannie Mae agreed to provide notice of the sale and then breached that agreement, did not arise from protected activity. Crossroads argues the promise at that time related only to the nonjudicial foreclosure sale and not the bankruptcy action. It also claims its request and Fannie Mae's promise were not offers or communications to settle the bankruptcy action.

We disagree with Crossroads. The requests for notice occurred as part of its attorney's discussion of settlement proposals with Fannie Mae's attorney. Although the bankruptcy court was no longer considering Fannie Mae's claim, the action remained pending and subject to settlement. The settlement discussions were thus protected as part of statements made in the action.

III

*Second Prong: Likelihood of Success on the Merits*

We have concluded Crossroads' claims based on Fannie Mae's responses to requests for accountings and tenders of performance, and Fannie Mae's promise to give notice of a sale, arose from protected activity. We now apply the anti-SLAPP statute's second prong to Crossroads' claims. As *Baral* stated, with this step, "the burden shifts to

27

the plaintiff to demonstrate the merit of the claim by establishing a probability of success. We have described this second step as a 'summary-judgment-like procedure.' [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.]" (*Baral, supra,* 1 Cal.5th at pp. 384-385, fn. omitted.)

"In analyzing whether the plaintiff has demonstrated a probability of prevailing on the merits, the court measures the plaintiff's showing against a standard similar to that used in deciding a motion for nonsuit, directed verdict, or summary judgment. The court determines only whether the plaintiff has made a prima facie showing of facts that would support a judgment if proved at trial." (*San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 11 Cal.App.5th 477, 495-496.)

Applying this step, we conclude that, with the exception of claims based on the oral agreement to give notice, Crossroads has not established the merits of its claims, and the anti-SLAPP motion should have been granted. This is because the protected statements were absolutely privileged under the litigation privilege of Civil Code section 47 against Crossroads' tort causes of action, and because Crossroads failed to introduce sufficient evidence to establish a prima facie case in support of its contract causes of action as a matter of law.

A. *Litigation privilege*

"The litigation privilege, found in Civil Code section 47, subdivision (b)(2), [section 47] 'applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.' (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.) The privilege 'immunizes

defendants from virtually any tort liability (including claims for fraud), with the sole exception of causes of action for malicious prosecution.' (*Olsen v. Harbison* (2010) 191 Cal.App.4th 325, 333.)  In the anti-SLAPP context, the litigation privilege presents 'a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing.' (*Flatley v. Mauro*[, *supra*,] 39 Cal.4th [at p.] 323.)  'Any doubt as to whether the privilege applies is resolved in favor of applying it.  [Citations.]'  (*Adams v. Superior Court* (1992) 2 Cal.App.4th 521, 529.)"  (*Greco v. Greco* (2016) 2 Cal.App.5th 810, 826.)

"For well over a century, communications with *'some relation'* to judicial proceedings have been absolutely immune from tort liability by the privilege codified as section 47(b).  At least since then-Justice Traynor's opinion in *Albertson v. Raboff* (1956) 46 Cal.2d 375, California courts have given the privilege an expansive reach."  (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1193-1194, italics added, fns. omitted.)  The privilege extends to "any publication . . . that is required [citation] or permitted [citation] by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is invoked."  (*Albertson v. Raboff, supra,* 46 Cal.2d at pp. 380-381.)

The litigation privilege also protects a defendant's silence having some relation to a judicial proceeding when the silence is communicative.  For example, courts have held the privilege applies when circumstances impose on the defendant a duty to speak and the defendant remains silent, thereby communicating that the circumstances do not exist. (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 210 [alleged failure to disclose preexisting relationship that could impact neutrality of an agreed-upon expert]; *Kupiec v. American Internat. Adjustment Co.* (1991) 235 Cal.App.3d 1326, 1333 [concealment of facts regarding status of the plaintiff's art found communicative in nature].)  The privilege also applies to omissions in communications designed to prompt public authorities to initiate proceedings for wrongdoing.  (*Forro Precision, Inc. v. International Business Machines*

29

*Corp.* (9th Cir. 1984) 745 F.2d 1283, 1285 [defendant's omissions in its statements to police leading to a search of plaintiff's property were privileged communications under section 47(b)].)

Of importance here, "[t]he reasonable relevancy requirement of section 47 is analogous to the 'in connection with' standard of [Code of Civil Procedure] section 425.16, subdivision (e)(2)." (*Neville v. Chudacoff, supra*, 160 Cal.App.4th at p. 1266.) It is true in some circumstances "[t]he fact that [] section 47 may apply does not mean the anti-SLAPP statute applies." (*Garretson v. Post, supra,* 156 Cal.App.4th at p. 1519, citing *Flatley v. Mauro, supra,* 39 Cal.4th at p. 325 [statutory extension of litigation privilege to nonjudicial foreclosure proceedings did not render those proceedings subject to anti-SLAPP statute].) It is also true that acts falling within the anti-SLAPP statute because of their connection with judicial proceedings do not "inevitably" fall within the litigation privilege. (*Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 770 (*Navellier II*).) However, by concluding the anti-SLAPP statute applies because Crossroads' claims arose from the response to an interrogatory and from statements and omissions made in settlement discussions in the bankruptcy action and concerning issues under review in the bankruptcy action, we readily find those statements and omissions have "some relation" to the bankruptcy action and thus are privileged under section 47. (*Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 970-971 [settlement negotiations are privileged under section 47].) Fannie Mae's silent refusals to accept tender were also privileged as they communicated Fannie Mae's rejection of the settlement offers and were responses to Crossroads' scheme to have the court approve its plan in lieu of proceeding through nonjudicial foreclosure. As a result, all of Crossroads' tort claims are barred under the litigation privilege and should have been stricken from the complaint under the anti-SLAPP motion except, in so far as they are based on Fannie Mae's oral agreement to give notice of the sale, as discussed below.

B.       *Contract causes of action*

As to Crossroads' contract claims, we conclude the litigation privilege does not apply to them except as they arise from Fannie Mae's response to the interrogatory. Generally, the litigation privilege precludes liability in tort, not liability for breach of contract.  (*Navellier II, supra,* 106 Cal.App.4th at p. 773.)  If one expressly contracts not to engage in certain speech or petition activity and then does so, applying the privilege would frustrate the very purpose of the contract if there was a privilege to breach it.  (*Id.* at p. 774.)  Thus, the privilege will apply to contract claims only if the agreement does not "clearly prohibit" the challenged conduct, and if applying the privilege furthers the policies underlying the privilege.  (*Vivian v. Labrucherie* (2013) 214 Cal.App.4th 267, 276-277.)

Crossroads alleges Fannie Mae breached the deed of trust.  That agreement required Fannie Mae, if it conducted a nonjudicial foreclosure, to sell the property "according to California law."  Crossroads alleges Fannie Mae violated this agreement because it conducted the foreclosure in violation of California law.  Applying the privilege to Crossroads' contract claims would not further the policies underlying the privilege.  In fact, it would defeat them.

" 'The principal purpose of section [47, subdivision (b),] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.'  (*Silberg v. Anderson*[, *supra*,] 50 Cal.3d [at p.] 213.)  Additionally, the privilege promotes effective judicial proceedings by encouraging ' "open channels of communication and the presentation of evidence" ' without the external threat of liability (*ibid.*), and 'by encouraging attorneys to zealously protect their clients' interests.'  (*Id.* at p. 214.)"  (*Flatley v. Mauro, supra,* 39 Cal.4th at pp. 321-322.)

Applying the privilege to Crossroads' contract actions, instead of promoting access to courts, would immunize Fannie Mae against any enforcement of its purported

31

violations of the deed and, in this instance, California foreclosure law.  Crossroads would never have an opportunity to go to court to enforce its contract requiring Fannie Mae to conduct its foreclosure according to California law.

As for the response to the interrogatory, neither section 2924c nor the deed of trust prohibited Fannie Mae from responding to the interrogatory as it did.  Applying the privilege to that activity furthers the policy underlying the privilege—encouraging the presentation of evidence without threat of liability.  Thus, the anti-SLAPP motion should have been granted against all contract claims to the extent they arose from Fannie Mae's response to the interrogatory.

We are left with determining whether Crossroads submitted sufficient evidence to show Fannie Mae (1) breached the deed of trust by (a) not responding to the oral requests for accountings, and (b) rejecting any valid tenders to reinstate or redeem the loan and (2) breached the oral agreement to give notice of the sale.  Initially, we conclude Crossroads submitted sufficient evidence to establish a prima facie showing of breach of the oral agreement to give notice.  Whether the agreement was made and breached is a sufficiently disputed issue of fact that cannot be resolved on an anti-SLAPP motion.

As for the remainder of its contract claims, Crossroads had to introduce sufficient evidence that Fannie Mae breached the deed of trust by violating section 2924c in order for its contract claims based on those actions to have survived the anti-SLAPP motion.  Crossroads failed to do so as a matter of law.

1. *Rejection of tenders*

We address first Fannie Mae's rejection of Crossroads' tenders.  Crossroads contends it submitted sufficient evidence establishing it orally tendered payment of the amount to reinstate and redeem the loan many times, and that Fannie Mae refused to accept each tender, in violation of section 2924c.  It did not specify when any of these tenders were made, except for the May 9, 2011 proposal.

32

Fannie Mae claims Crossroads cannot recover on its claims based on the rejection of tender because it did not submit any evidence that established its tenders were valid. We agree with Fannie Mae.

As stated earlier, "[a] tender is an offer of performance made with the intent to extinguish the obligation (Civ. Code, § 1485). When properly made, it has the effect of putting the other party in default if he refuses to accept it. [Citations.] When a party makes a tender of full payment to the holder of a promissory note when or after it is due, he is discharged to the extent of all subsequent liability for interest, costs and attorney's fees. (Com. Code, § 3604; Civ. Code, § 1504.)

"However, a tender to be valid must be of full performance (Civ. Code, § 1486), and it must be unconditional. (Civ. Code, § 1494; [citations].)" (*Still v. Plaza Marina Commercial Corp., supra,* 21 Cal.App.3d at p. 385.) Tender must also be in good faith. (Civ. Code, § 1493.) If the party making the offer is unable or unwilling to perform, the tender is of no effect. (Civ. Code, § 1495; *Karlsen v. American Sav. & Loan Assn.* (1971) 15 Cal.App.3d 112, 118.)

The May 9, 2011 tender was not a valid tender. It was conditioned on Fannie Mae relinquishing its claim to the prepayment premium.

The tenders made before the stay was lifted also were invalid tenders, as they were either conditional or not for full performance. Crossroads' entire evidentiary showing that it tendered performance to Fannie Mae before the stay was lifted consists of the following paragraph from Young's declaration: "Throughout the time in which Crossroads' bankruptcy proceeding was pending, I, on behalf of Crossroads, repeatedly advised [Fannie Mae] that Crossroads was ready, willing and able to cure the default and/or pay off the loan, upon being provided with the amount required to cure the default and/or pay off the loan. Crossroads had the financial ability to fulfill its tender offers because Ezralow had agreed to pay those funds on its behalf. Although Crossroads opposed the payment of prepayment penalties, the contracted for sales price to Ezralow

33

was sufficient to pay the entire amount demanded by [Fannie Mae]. *Accordingly*, I, on behalf of Crossroads, advised [Fannie Mae], on multiple occasions, that *if* the bankruptcy court determined that [Fannie Mae] was owed prepayment penalties, *then* Crossroads would pay [Fannie Mae's] claim in full." (Italics added.)

Young's statement demonstrates Crossroads' tenders were invalid. They either were not for full performance or they were conditional. Young stated Crossroads would include the prepayment premium in its tender only if the bankruptcy court determined Fannie Mae was entitled to claim the premium. This shows all of Crossroads' tenders to pay off the loan were either for less than the amount due under the terms of the contract, or they were conditioned on the bankruptcy court ruling in Fannie Mae's favor.[11]

To be valid, a tender must be for full performance under the terms of the note and must not be conditional. Section 2924c authorized Crossroads to reinstate the loan only by paying what was then due under the terms of the note and deed of trust, whether or not the legality of those terms was under review in the bankruptcy action. Crossroads could reinstate by "pay[ing] to the beneficiary or the mortgagee . . . the entire amount due . . . *under the terms of the deed of trust or mortgage and the obligation secured thereby*," as

---

[11]  Young's statement is almost identical to Crossroads' complaint, which, framing the issue before us, more clearly alleges Crossroads' tenders consisted of either amounts not including the prepayment penalty or amounts conditioned on the bankruptcy court's ruling. The verified complaint reads: "Throughout the time in which plaintiff's bankruptcy proceeding was pending, Crossroads repeatedly advised [Fannie Mae] that it was ready, willing and able to cure the default. Crossroads also advised [Fannie Mae], on multiple occasions, that it was ready, willing and able to pay [Fannie Mae's] loan in full. [Fannie Mae] refused to accept Crossroads' offer to tender the amount needed to cure the default, nor Crossroads' tender of the full payment of principal and interest owed on its note, because it also wanted to receive prepayment penalties. Although Crossroads opposed the payment of prepayment penalties, the contracted for sale price to Ezralow was sufficient to pay the entire amount demanded by [Fannie Mae]. Accordingly, Crossroads advised [Fannie Mae], on multiple occasions, that if the bankruptcy court determined that [Fannie Mae] was owed prepayment penalties, then it would pay [Fannie Mae's] claim in full from the close of the escrow of the sale of the property to Ezralow."

well as the amounts in default on recurring obligations and the costs incurred in enforcing the obligation. (§ 2924c, subd. (a)(1), italics added.)

Similarly, Crossroads was entitled to redeem the loan only "by performing, or offering to perform, the act for the performance of which it is a security, and paying, or offering to pay, the damages, if any, to which the holder of the lien is entitled for delay." (Civ. Code, § 2905.) "It is obvious even the owner of the property cannot redeem it from a lien without tendering the amount due *under its terms, including the terms governing a default*. [Citations.]" (*Pacific Trust Co. TTEE v. Fidelity Fed. Sav. & Loan Assn.* (1986) 184 Cal.App.3d 817, 825, italics added [to redeem the loan, junior lienholder had to pay all obligations required by the contract, including prepayment penalty the lienholder paid under protest and later challenged].)

In short, Crossroads could not condition its cure or redemption of the loan based on its contention the prepayment premium was unenforceable. Thus, any tenders that were made for any amount other than what was due and owing under the terms of the note and deed of trust, including the May 9, 2011 proposal, were not valid tenders for purposes of redeeming or reinstating the loan. The anti-SLAPP motion should have been granted against all claims based on any tenders that did not include full payment as required under the terms of the loan or were conditioned on a ruling by the bankruptcy court.

The remaining tenders, including those made by Young to Napolitano after the stay was lifted, to pay Fannie Mae all it was owed under the note and deed of trust, including the prepayment penalty, also should have been stricken. Merely stating one is ready, willing, and able to tender payment upon learning what is owed is insufficient tender where the notice of default informed the debtor of a minimum amount owed and the debtor tendered no payment of at least that amount. If Fannie Mae refused to provide Crossroads the amount required to reinstate or redeem the loan, Crossroads at a minimum had to tender payment in a specific amount based on the information in its possession in

35

order to stop the foreclosure. "The adequacy of the tender turns on the amount owed and the burden is placed on [the beneficiary] by [Civil Code] sections 2924 and 2924c to inform [the trustor] correctly about the amounts 'then due' on the obligations properly noticed in the notice of default and the foreclosure costs. This information is in the possession of the beneficiary. [The trustor] is under no obligation to second-guess the amount. Given that information he is *required* to project the amount presently due and *to tender that amount as a cure of the default*. If the tender falls short in a sum attributable to the failure of the beneficiary to carry its burden of providing the trustor with accurate information, the trustor is entitled to prevail on the merits." (*Anderson v. Heart Federal Sav. & Loan Assn*. (1989) 208 Cal.App.3d 202, 217, italics added [payment of tender based on the last information debtor had received from the beneficiary was sufficient to establish a triable issue of fact of proper tender in wrongful foreclosure action].)

Here, Crossroads had sufficient information to make a specific tender that, in light of Fannie Mae's failure to respond to the requests for accountings, could have entitled Crossroads to reinstate or redeem the loan successfully. The notice of default informed Crossroads it had to pay at least $286,900.10 in order to reinstate the loan. And Fannie Mae's proof of claim in the bankruptcy court informed Crossroads it had to pay at least $10,335,603.15 to redeem the loan. Had Crossroads tendered payment of either of these amounts upon Fannie Mae not providing it with the current amounts required to reinstate or redeem the loan, it could have successfully stopped the foreclosure even if those amounts were less than what was owed under the note. Crossroads, however, has introduced no evidence showing it tendered payment of those amounts to Fannie Mae even once. Because Crossroads failed to tender any specific payment in at least those amounts, its claims based on Fannie Mae's rejections of tender should have been stricken. It failed to make legally valid tender.

36

2. *Not responding to requests for accountings*

Crossroads contends it introduced sufficient evidence to establish a prima facie case that Fannie Mae breached the deed of trust by violating section 2924c, which it did by not providing the amounts required to reinstate and redeem the loan when Crossroads requested them. We disagree, as Crossroads introduced no evidence showing its damage was caused by Fannie Mae's breach.

"A cause of action for breach of contract requires pleading of a contract, plaintiff's performance or excuse for failure to perform, defendant's breach and damage to plaintiff resulting therefrom. [Citation.]" (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1489.)

"In breach of contract actions, damages cannot be *presumed* to flow from liability. 'It is essential to establish a *causal connection* between the breach and the damages sought. [Citations.]" [Citation.] This rule has been codified in Civil Code section 3300, which reads: 'For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the *detriment proximately caused* thereby, or which, in the ordinary course of things, would be likely to result therefrom.' (Italics added.)

"Ordinarily, the issue of causation is a question of fact for the jury. [Citations.] However, under the principles applicable to directed verdict motions [and, we may add, by its similar nature, an anti-SLAPP motion], if there is no substantial evidence to support a verdict in plaintiff's favor if such a verdict were given, and no other reasonable conclusion is legally deducible from the evidence, the trial court is entitled to decide the issue as a matter of law. [Citation.]" (*Metzenbaum v. R.O.S. Associates* (1986) 188 Cal.App.3d 202, 211-212, original italics.)

Crossroads contends Fannie Mae's refusal to provide the accountings damaged it by preventing it from being able to cure the default or pay off the loan, and thereby

37

subjecting Crossroads to the complete loss of the property. Crossroads also alleges Fannie Mae's actions damaged it by preventing it from being able to sell the property for a price that would have paid Fannie Mae in full and would have provided a substantial return to Crossroads.

There is no evidence Fannie Mae's refusal to provide the accountings proximately caused damage to Crossroads. Crossroads damaged itself. From February 1, 2011, when Fannie Mae recorded the notice of default, until May 19, 2012, five days before Fannie Mae sold the property, Crossroads possessed and maintained the right to reinstate the loan whether or not Fannie Mae responded to the requests, and it failed to act on that right. It possessed the right to redeem the loan up until the moment of sale on May 24, 2012, whether or not Fannie Mae responded to the requests, and it failed to act on that right. Fannie Mae's refusals, instead of damaging Crossroads, actually benefitted it. As already stated, because Fannie Mae failed to provide the requested amounts, Crossroads could have reinstated or redeemed the loan by tendering payment based on the information Fannie Mae had provided in the notice of default or the bankruptcy proof of claim. If those amounts were less than what Crossroads actually owed under the note and deed of trust, and Crossroads paid those amounts, Fannie Mae's omissions damaged Fannie Mae, not Crossroads, as paying those amounts would have stopped the foreclosure. If those amounts were more than what Crossroads actually owed, it could still pay them under protest to reinstate or redeem the loan in order to maintain possession of the property, and then seek to recover the amount it overpaid. But Crossroads tendered no payment.

Having suffered no damage from Fannie Mae's failure to respond to the requests for accounting, Crossroads cannot recover on its contract claims based on those omissions. The anti-SLAPP motion should have been granted against them.

38

DISPOSITION

The order denying Fannie Mae's anti-SLAPP motion is reversed. The matter is remanded and the trial court is directed to enter an order granting the anti-SLAPP motion and striking the allegations relating to, and all claims alleged against Fannie Mae except those which arise from Fannie Mae's alleged breach of an oral agreement to provide notice of the foreclosure sale.

Costs on appeal are awarded to Fannie Mae. (Cal. Rules of Court, rule 8.278(a).)


      NICHOLSON     , Acting P. J.


We concur:


     ROBIE         , J.


     DUARTE       , J.