Filed 8/30/24 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHARONDA TAYLOR et al.,<br><br>  Plaintiffs and Respondents,<br><br>  v.<br><br>TESLA, INC.,<br><br>  Defendant and Appellant. | A168333<br><br>(Alameda County Super. Ct. No. 23CV028922)<br><br>ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

BY THE COURT:*

The court orders that the opinion filed in this appeal on August 8, 2024, be modified as follows:

1. On page 7, in the last sentence of the paragraph that continues from page 6, add quotation marks around the word "omissions," so the sentence reads:

   Claiming to have been taken by surprise, Crossroads sued Fannie Mae, seeking to rescind the sale on the ground that deceptive statements and "omissions" by Fannie Mae in the bankruptcy proceedings deprived it of its statutory redemption rights.

2. On page 10, in the first paragraph that begins "It seems clear," delete the third sentence that reads (retaining footnote five):

---

* Brown, P. J., Streeter, J., Hite, J. (Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.)

1

We note that the "omissions" in *Crossroads*—information withheld in discovery and a silently communicated rejection of settlement overtures—necessarily expressed a message.

Insert in place of the deleted sentence indicated above, continuing within the same paragraph, the following substitute language (ending with footnote 5):

We do note that the "omissions" in *Crossroads*—apparently, information withheld in discovery and a silently communicated rejection of settlement overtures—necessarily expressed a message pertinent to the tort causes of action at issue there.

3. On page 17, In the second sentence of the first paragraph, delete the language "made no effort to produce anything" and replace with the language "produced virtually nothing" so the sentence reads:

Faced with many requests for information that had nothing to do with the allegations in *Vaughn*, Tesla produced virtually nothing.

The modifications effect no change in the judgment.

Date: _____          ___Brown_____P. J.

2

Trial Court:      Superior Court of California, County of Alameda

Trial Judge:     Hon. Julia Spain

Counsel:          Reed Smith, Raymond A. Cardozo; Holland & Knight and Christina T. Tellado for Defendant and Appellant.

                     Nichols Kaster, Matthew C. Helland, Jasjit Mundh; California Civil Rights Law Group, Lawrence Organ; Bryan Schwartz Law and Bryan Schwartz for Plaintiffs and Respondents.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHARONDA TAYLOR et al.,<br><br>      Plaintiffs and Respondents,<br><br>                              v.<br><br>TESLA, INC.,<br><br>      Defendant and Appellant. | A168333<br><br>(Alameda County Super. Ct.<br>No. 23CV028922) |

In this Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.) action, Tesla Inc. (Tesla) appeals from the denial of a motion under the anti-SLAPP statute (Code Civ. Proc., § 425.16).[1]  Seeing no merit to any of Tesla's arguments, we affirm.

**I.**

Plaintiffs Sharonda Taylor, Shaka Green, Tatianna Smith and Zenobia Milligan worked for Tesla for different periods between July 2015 through March 2022.  Through their counsel, Bryan Schwarz Law (BSL), they each requested that Tesla provide them with certain personnel records pursuant to the California Labor Code.

BSL serves as counsel for the plaintiffs in *Vaughn v. Tesla,* Alameda County Superior Court No. RG17882082 (*Vaughn*), a class action filed

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

1

against Tesla on November 13, 2017.  As alleged, the *Vaughn* class consists of "all African-Americans who were employed on the production floor at the Tesla Factory at any time from November 9, 2016 to the final disposition of [the Vaughn] action."  During the pendency of this appeal, a class certification order issued in *Vaughn*.[2]

Taylor, Green, Smith, and Milligan are members of the *Vaughn* class. On behalf of the class, the *Vaughn* complaint alleges racial discrimination and racial harassment claims against Tesla under the Fair Employment and Housing Act.  These allegations of race discrimination in *Vaughn* have been closely watched and widely reported on by the press.

Prior to certification of the *Vaughn* class, considerable discovery activity took place.  This discovery activity included a series of motions to compel and an associated motion for a protective order in the summer 2020. The motions focused generally on BSL's attempt to obtain witness contact information, internal complaints and investigation materials pertaining to incidents of racial harassment at Tesla.

In June 2020, the *Vaughn* court issued orders addressing the issues raised in these discovery motions, including the manner in which privacy notices to absent class members should be handled.[3]  In its orders, the *Vaughn* court suggested "by way of observation" that the parties "might consider" including "an opt-in privacy waiver for review of complaint and personnel files."  This suggestion was designed to confine the universe of

---

[2] On our own motion, we take judicial notice of the May 17, 2024 class certification order in *Vaughn*.  (Evid. Code, § 452, subds. (c)–(d).)

[3] See *Belaire-West Landscape, Inc. v. Superior Court* (2007) 149 Cal.App.4th 554, 561 (approving privacy waiver opt-in procedure in pre-certification class discovery where defendant employer was being required to provide confidential personnel information about absent class members).

2

"files to be reviewed" to those who signed privacy waivers, thus limiting the pre-certification discovery burden on Tesla.

A few months later, the *Vaughn* court ordered Tesla to produce complaints pertaining to incidents of racial harassment (including investigation and resulting discipline), but only for those complaining workers who signed a privacy waiver. In accordance with this order, from October to November 2020, BSL sent Tesla privacy waivers in five batches, after which Tesla was to produce the waivants' race harassment complaints.

Beginning in October 2020, on behalf of hundreds of Tesla employees for whom privacy waivers were provided, BSL sent Tesla a series of statutory personnel records requests under Labor Code sections 226, 432, and 1198.5. The requestors included Milligan, Taylor, Green and Smith. BSL resubmitted the personnel records requests for Taylor and Milligan in early 2021, apparently after Tesla questioned whether the digital signatures on the privacy waivers accompanying the first set of requests for these two individuals were adequate.

Later in 2021, other procedural events in *Vaughn* impacted the timetable for Tesla's compliance with these discovery and Labor Code records requests. In September 2021, the *Vaughn* court granted in part and denied in part Tesla's motion to compel arbitration of the claims brought by two *Vaughn* plaintiffs, and Tesla appealed. The court then stayed all trial court proceedings in *Vaughn* until the appeal was resolved.

In February 2022, Tesla's counsel wrote to BSL and took the position that the *Vaughn* stay suspended any obligation to respond to the pending Labor Code records requests. In line with that position, Tesla produced nothing in response to these requests. Having received no responses to its information requests under the Labor Code, on April 19, 2022, BSL sent a

3

letter to the California Labor and Workforce Development Agency (LWDA) on behalf of Taylor, Green, Smith, and Milligan alleging PAGA violations.

In its letter to LWDA, BSL argued that "internal complaints made by an employee and evidence of an ensuing non-attorney investigation are included within the definition of personnel files." It also argued that Tesla had "repeatedly provided deficient personnel files in violation of Labor Code § 1198.5" by not "includ[ing] any record of internal complaints that were made by the requesting employee or former employee or any resulting investigation." BSL further asserted that Tesla's productions of personnel records were deficient because Tesla "routinely omitted requestors' job applications and any of the documents that the requestor signed at the start of employment" and had produced some documents, such as "performance reviews . . . in unintelligible formats, such as tables that are split across dozens of pages with no indication of their actual organization."

In January 2023, Division Five of this court affirmed the *Vaughn* court's partial denial of Tesla's motion to compel arbitration. (*Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208.) Following the issuance of the remittitur in that appeal, the stay on proceedings in *Vaughn* was lifted. The allegations of Labor Code violations in BSL's notice letter to the LWDA remained live, however, since by then Tesla had been delinquent in responding to the statutory records requests for the better part of a year.

This PAGA action followed. On March 7, 2023, represented by BSL, plaintiffs filed their PAGA complaint seeking penalties for Tesla's failure to respond to Labor Code personnel records requests. The complaint alleges a single cause of action alleging as predicate violations Tesla's refusal to comply with Labor Code sections 1198.5, 226, and 432. Tesla answered and filed a special motion to strike pursuant to the anti-SLAPP statute.

The trial court denied Tesla's anti-SLAPP motion on July 7, 2023. The court found that "Tesla did not meet its initial burden as the movant to make a 'threshold showing that [Plaintiffs'] claims arise from petitioning activity within the purview of the anti-SLAPP statute.'" "On this record," the court ruled, "Plaintiffs were merely exercising their statutory rights under the Labor Code to inspect and copy wage statements, signed instruments, and personnel files, independent of anything happening in *Vaughn*."

Now before us is Tesla's appeal from the denial of its anti-SLAPP motion in the PAGA case.

## II.

We assume familiarity with the two-step framework of analysis under the anti-SLAPP statute. (See, e.g., *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884–885; *Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 593–594; *id.* at pp. 594–601 [first prong], 602–604 [second prong].) Our review is de novo at both steps. (*Area 51 Productions,* at pp. 593–594.)

### A.

In support of its contention that denial of its anti-SLAPP motion was erroneous, Tesla relies heavily on *Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757 (*Crossroads*). That case involved a lawsuit filed and pursued by a real estate investment partnership (Crossroads) against the Federal National Mortgage Association (Fannie Mae) in connection with a chapter 11 bankruptcy proceeding. (*Id.* at p. 769.) Because of the centrality of *Crossroads* to Tesla's argument, we begin with an overview of the case. The appellate opinion there is somewhat complex, and to apply its holding properly, some nuances must be kept in mind.

Crossroads, the owner of an apartment building, was the debtor on a mortgage loan that fell into default at the height of the mortgage foreclosure

5

crisis in 2011. (*Crossroads*, *supra*, 13 Cal.App.5th at p. 766.) On the day before a scheduled foreclosure sale, Crossroads filed for bankruptcy. (*Id.* at p. 767.) Fannie Mae was the mortgage holder and a creditor in the bankruptcy. Many of the alleged acts by Fannie Mae took place in the course of the bankruptcy proceedings while an automatic stay was in place (*id.* at pp. 767–771), but at its core the seven-count complaint Crossroads filed after the bankruptcy was over bore the hallmarks of a wrongful foreclosure claim. (See *Miles v. Deutsche Bank National Trust Co.* (2015) 236 Cal.App.4th 394, 407–410.)

Despite having sent the required written notice of default informing Crossroads it could reinstate the delinquent mortgage loan by tendering the overdue amount no later than five business days before the foreclosure sale (*Crossroads*, *supra*, 13 Cal.App.5th at p. 766), and despite having orally promised in settlement discussions that, after the automatic bankruptcy stay was lifted, it would give advance notice before proceeding with a foreclosure sale (*id.* at pp. 770–771), Fannie Mae allegedly sold the mortgaged property at a foreclosure auction immediately after the stay was lifted, without giving the promised notice and without providing an accounting of exactly how much was owed on the delinquent loan (*id.* at p. 771).

Crossroads had unsuccessfully argued in bankruptcy court as part of its proposed plan of reorganization (which ultimately the bankruptcy court rejected) that it should not have to pay a prepayment penalty in order to redeem its mortgage loan, and it made a settlement proposal conditioned on Fannie Mae waiving that penalty. (*Crossroads*, *supra*, 13 Cal.App.5th at pp. 768–769.) In an interrogatory response in the bankruptcy proceeding, Fannie Mae declined to provide the exact amount of the mortgage loan delinquency. (*Id.* at p. 769.) And in the settlement discussions, Fannie Mae refused to accept any tender of delinquent proceeds without the prepayment

6

penalty. (*Id.* at pp. 770–771.) After the stay was lifted, Fannie Mae proceeded with a foreclosure sale to a willing buyer. (*Id.* at p. 771.) Claiming to have been taken by surprise, Crossroads sued Fannie Mae, seeking to rescind the sale on the ground that deceptive statements and omissions by Fannie Mae in the bankruptcy proceedings deprived it of its statutory redemption rights. (*Id.* at pp. 771–772.)

Against this backdrop, the trial court denied Fannie Mae's anti-SLAPP motion to strike the entire complaint. (*Crossroads*, *supra*, 13 Cal.App.5th at p. 772.) A Third District Court of Appeal panel reversed. (*Id.* at pp. 793– 794.)[4] At the initial step of the anti-SLAPP analysis, the *Crossroads* panel concluded that the first six causes of action in the state court case—which it broadly termed the "tort causes of action"—were based on anti-SLAPP protected activity. (*Crossroads*, at p. 777–785.) Relying on section 425.16, subdivisions (e)(1) and (e)(2), the panel viewed the basis of these claims as protected "because (1) [Fannie Mae's] response to the interrogatory was a 'writing made' in the bankruptcy action, and (2) its omissions were 'made in connection with an issue under consideration or review by' the bankruptcy court." (*Id.* at p. 778.)

At the second step of the anti-SLAPP analysis, the panel went on to find the litigation privilege applicable to all of Crossroads's tort theories. (*Crossroads*, *supra*, 13 Cal.App.5th at pp. 785–787, citing *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953.) "[B]y concluding the anti-SLAPP statute applies because Crossroads' claims arose from the response to an

---

[4] In a prior opinion, the panel affirmed. The California Supreme Court granted review, depublished the prior opinion, and transferred the case back to Court of Appeal for reconsideration in light of *Baral v. Schnitt* (2016) 1 Cal.5th 376. (*Crossroads*, *supra*, 13 Cal.App.5th at pp. 765–766.)

interrogatory and from statements and omissions made in settlement discussions in the bankruptcy action and concerning issues under review in the bankruptcy action, we readily find those statements and omissions have 'some relation' to the bankruptcy action and thus are privileged under section 47," the court held. (*Crossroads*, at p. 787.) On that basis, it directed that all of the tort claims be stricken for lack of minimal merit. (*Id.* at pp. 785–787.)

While the litigation privilege did not apply to the breach of contract claim (*Crossroads*, *supra*, 13 Cal.App.5th at p. 787)—that claim involved the same conduct alleged in the tort claims, but without any additional element of deceit—the court concluded that most of Crossroads' contract theories lacked minimal merit because it failed to show proof of damages or evidence that it had submitted valid tenders to Fannie Mae. (*Id.* at pp. 789–793.) One sliver of Crossroads' breach of contract claim survived (alleged breach of an oral agreement to give notice of the foreclosure sale). (*Id.* at p. 788.) Except for this one surviving theory of breach, the contract claim too was ordered stricken. (*Id.* at pp. 793–794.)

## B.

All of the tort claims in *Crossroads*, as we have noted, were based on statements or information withheld by Fannie Mae in the course of discovery or settlement negotiations in a bankruptcy proceeding. Framing their arguments around Tesla's contention that *Crossroads* controls here, the parties to this appeal devote a great deal of attention to whether BSL's statutory personnel records requests were made "in *Vaughn*." Plaintiffs suggest that the class discovery process in *Vaughn* and the statutory personnel records request process for individual Tesla employees proceeded in parallel, but independently. Tesla, on the other hand, argues that the class discovery process and the statutory records requests proceeded in a coordinated way, with the *Vaughn* court overseeing, issuing orders, and

8

giving guidance relating to both. In our view, this debate over whether BSL's statutory records requests were made "in *Vaughn*" is not particularly germane to Tesla's primary step one argument.

Under section 425.16, subdivision (e)(2), Tesla contends, " 'A statement is "in connection with" an issue under consideration by a court in a judicial proceeding . . . if it *relates to* a substantive issue in the proceeding and is directed to a person having some interest in the proceeding.' " (*Crossroads, supra*, 13 Cal.App.5th at p. 779, original italics.) But Tesla overlooks a crucial threshold issue. Subdivisions (e)(1) through (e)(3) of section 425.16 all require a "written or oral statement or writing." Unlike the scenario in *Crossroads*, this case involves no protected activity covered by section 425.16, subdivision (e)(2) because no "written or oral statement or writing" by Tesla is an "element" of the PAGA claim at issue here. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063.)

At most, to the extent any communication or other expressive activity by Tesla is relevant, it is a matter of "incidental background." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1012; see *Park*, at p. 1064 [drawing "distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim"].) At trial, plaintiffs may establish predicate violations of Labor Code sections 226, 432, and 1198.5 in support of their PAGA claim without offering any writing or any oral statements by Tesla. They need only prove that they sent statutory demands for personnel files and never received any files in response. It is certainly conceivable that, for context, some party to the PAGA action might wish to offer, say, *Vaughn* discovery meet-and-confer correspondence or pleadings or orders from *Vaughn*—either in support of the PAGA claim or by way of defense to it—but if such evidence were

offered, it would be relevant only as a collateral matter for background purposes.

It seems clear, to be sure, why Tesla places so much weight on *Crossroads*: The case finds "omissions" as well as affirmative statements to be protected under section 425.16, subdivision (e). But in so holding, the *Crossroads* court does not explain why the "omissions" at issue there were treated as "written or oral statement[s] or writing[s]" within the meaning of section 425.16, subdivision (e)(1) and (2). We note that the "omissions" in *Crossroads*—information withheld in discovery and a silently communicated rejection of settlement overtures—necessarily expressed a message.[5] In circumstances where a refusal to speak is inherently expressive, the reading of the statutory text adopted in *Crossroads* might be justified. But Tesla

---

[5] While this aspect of the step one anti-SLAPP analysis in the *Crossroads* opinion is somewhat opaque, the litigation privilege holding at step two of its analysis may shed some light on how the court viewed the issue of communicative conduct under section 425.16, subdivision (e)(1) and (2). It is often said that the existence of anti-SLAPP protected activity and the availability of the litigation privilege are related and the inquiry into one informs the other. (*Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 770.) In the course of addressing whether Fannie Mae's conduct was covered by the litigation privilege, the *Crossroads* court had to deal with the threshold requirement under Civil Code section 47, subdivision (b) that, for the privilege to apply, the conduct claimed to be privileged must be communicative. (*Mancini & Associates v. Schwetz* (2019) 39 Cal.App.5th 656, 661; see *Kimmel v. Goland* (1990) 51 Cal.3d 202, 211.) The court found that Fannie Mae's various omissions to speak were "in their essential nature, communicative." (*Kupiec v. American Internat. Adjustment Co.* (1991) 235 Cal.App.3d 1326, 1333.) And to illustrate the point, it cited authority for the concept of fraud by half-truth. (See *Crossroads, supra,* 13 Cal.App.5th at p. 786, citing *Silberg v. Anderson* (1990) 50 Cal.3d 205, 211, *Kupiec v. American Internat. Adjustment Co., supra*, 235 Cal.App.3d at p. 1333, and *Forro Precision, Inc. v. International Business Machines Corp.* (9th Cir. 1984) 745 F.2d 1283, 1285.)

makes no contention that it engaged in such conduct here. Whatever the basis of the *Crossroads* holding on this point, we hold that, absent inherently expressive silence, a refusal to speak is simply conduct, and under the section 425.16, subdivision (e) schema, conduct is most naturally covered by subdivision (e)(4).

Apparently recognizing this, as a secondary line of argument Tesla invokes section 425.16, subdivision (e)(4), the so-called "catchall" provision in the statutory scheme. (See *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 148–152 (*FilmOn*).) Section 425.16, subdivision (e)(4), expressly covers "conduct," not just "written or oral statement[s] or writing[s]." Applying that provision, the issue presented is whether Tesla's conduct in refusing to comply with BSL's statutory records requests was "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) But Tesla fares no better with section 425.16, subdivision (e)(4) than it does with subdivision (e)(2).

Under what has come to be known at the content-and-function test, *FilmOn* supplies the applicable analysis. "The inquiry under the [section 425.16, subdivision (e)(4)] catchall provision," the *FilmOn* court explained, "calls for a two-part analysis rooted in the statute's purpose and internal logic. First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. (§ 425.16, subd. (e)(4).) Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*FilmOn*, *supra*, 7 Cal.5th at pp. 149–150.)

*Geiser*, our Supreme Court's latest word on section 425.16, subdivision (e)(4), clarifies the test enunciated in *FilmOn*. (*Geiser v. Kuhns* (2022)

11

13 Cal.5th 1238, 1248–1256 (*Geiser*).)  The first step of the *Geiser* test "is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute.  Only when an expressive activity, viewed in context, cannot reasonably be understood as implicating a public issue does an anti-SLAPP motion fail at *FilmOn*'s first step." (*Id.* at pp. 1253–1254.)  While the proper application of the content-and-function test on this record is close and somewhat novel, we think plaintiffs have the better side of the argument.

The two contending positions on this issue are starkly different, not surprisingly.  According to plaintiffs, the discovery disputes in *Vaughn* amount to nothing more than a private controversy featuring some routine squabbling among lawyers, with the substantive allegations of race discrimination in that case playing an incidental part in the background. (See *Doe v. Ledor* (2023) 97 Cal.App.5th 731 [letter to college admissions department sent by disgruntled friend of admitted student making disparaging statements about admittee's character did not contribute to any public conversation about an issue of public interest].)  Tesla, on the other hand, relies on its own public prominence, points to a few statements from BSL about how Tesla is a "half a trillion dollar company," and emphasizes how the injunctive relief in *Vaughn* "would inure to the benefit of not only current Tesla employees, but to the benefit of their families and their communities, as well as to the benefit of future Tesla applicants and employees." (See *Vaughn v. Tesla, Inc.*, *supra*, 87 Cal.App.5th at p. 232 [relief sought in *Vaughn* qualifies as a public injunction and is therefore exempt from arbitration].)

We do not wholly agree with either characterization.  Plaintiffs' effort to characterize the dispute in this case as purely a private matter is strangely

divorced from the ongoing contest in *Vaughn*. We believe there is a public issue in play here, though plaintiffs do their best to avoid the subject: It is the core allegation in *Vaughn* that, for years, Tesla has been turning a blind eye to racial harassment of African-American employees at its Fremont plant. Tesla's publicly reported narrative about these accusations is that, in reality, the pattern of harassment alleged in *Vaughn* consists of isolated, unintentional insensitivity by a few employees, and that complaints by any offended workers should have been resolved by private reconciliation.[6]

But Tesla's effort to show that it meets the content-and-function test is also unpersuasive. Its size and reputation, while a relevant factor, is irrelevant in and of itself absent a demonstrated connection between its petitioning activity and a public issue. The scope of the relief sought in *Vaughn* fails to supply such a connection since it is tenuously related, at best, to the parties' quarrel over the production of employee files. As we read its opening brief, the closest Tesla comes to identifying a section 425.16, subdivision (e)(4) public issue is its narrow suggestion that the dispute over production of employee files "highlights that the law is unsettled regarding a party's obligations" when faced with Labor Code information requests made in parallel with ongoing discovery in a related action. But that is a stretch. Interesting though this issue of discovery law may be to civil litigators and judges, it is too parochial to qualify as an "issue of public interest" under section 425.16, subdivision (e)(4).

---

[6] The Chief Executive of Tesla, Elon Musk, reportedly wrote an email to Tesla employees in May 2017 stating "[p]art of not being a huge jerk is considering how someone might feel who is part of [a] historically less represented group . . . Sometimes these things happen unintentionally, in which case you should apologize. In fairness, if someone is a jerk to you, but sincerely apologizes, it is important to be thick-skinned and accept that apology."

Ironically, in straining to identify a public issue, Tesla seems just as allergic to the actual public controversy lurking in the background here as the plaintiffs are. Despite the elephant in the room—the allegations of racism leveled against it—we see nothing on this record to show how Tesla's act of refusing to produce the personnel files plaintiffs demanded under the Labor Code could somehow constitute petitioning activity "contribut[ing]" to, "further[ing]," or "participat[ing] in" debate on the public issue being contested in *Vaughn*. (*FilmOn*, *supra*, 7 Cal.5th at pp. 151–154; *Geiser*, *supra*, 13 Cal.5th at pp. 1246, 1255.) In the end, that is the critical hurdle Tesla cannot overcome at step one of the anti-SLAPP analysis.

Tesla's refusal respond to plaintiffs' Labor Code requests for personnel files does not qualify as petitioning activity protected by section 425.16, subdivision (e)(4) simply because of the pendency of hotly contested litigation on a public issue in a related case. The plaintiffs did not lose their rights to demand information the Labor Code entitles them to receive simply because BSL drew up a plaintiff class that includes them. (*Wilder v. Superior Court* (1998) 66 Cal.App.4th 77 (*Wilder*) [plaintiff seeking to obtain investigation information in support of claim against public agency entitled to pursue statutory public records request independent of discovery process in litigation of her claim].) BSL's Labor Code requests sought wage statements, attendance records, and an array of other quotidian information typically found in employee files. Although some of the Labor Code requests sought evidence relating to racial harassment complaints—which is no doubt why the background allegations in the PAGA complaint reference these complaints—the requests, in their full scope, sought a far broader universe of information than did the harassment-focused discovery Tesla faced in *Vaughn*.

Tesla never expressly ties its argument that plaintiffs' Labor Code personnel file requests were made "in *Vaughn*"—which is a running theme throughout its briefs—to its claim of section 425.16, subdivision (e)(4) protection. But we gather it places so much weight on the made "in *Vaughn*" theme because it wants us to conclude that refusing to respond to plaintiffs' statutory information requests was, as a practical matter, petitioning activity undertaken in support of its defense of the *Vaughn* case. On this record, based on the arguments Tesla made in the trial court, as reiterated here on appeal, we see no basis to do so. The connection between Tesla's refusal to respond to plaintiffs' statutory information requests and the public issue being litigated in the *Vaughn* case is too attenuated to trigger section 425.16 subdivision (e)(4) protection under the second step of the *FilmOn-Geiser* test, despite the subject matter overlap between those information requests and the allegations in *Vaughn*.

No doubt because of that overlap, the *Vaughn* parties and the *Vaughn* court appear to have tried to coordinate the pre-certification class discovery process with the statutory information requests the plaintiffs were simultaneously making under the Labor Code. But that does not mean these information requests were made "in *Vaughn*." "It may well have been the case," as the *Wilder* court stated, "that the documents . . . requested" by the appellant there would be used "to ascertain whether grounds for . . . a claim or lawsuit existed" (*Wilder, supra*, 66 Cal.App.4th at p. 83), but she was still entitled to obtain the documents by independent statutory authority. The same is true here. Regardless of their status as putative unnamed class members, plaintiffs were entitled to seek whatever information the Labor Code authorized them to seek, unconstrained by the strictures of the *Vaughn* discovery process.

The trial court recognized this, correctly citing *Wilder* at one point to indicate it had no authority to supervise plaintiffs' Labor Code information requests as part its management of pre-certification discovery in the *Vaughn* proceedings. To the extent these information requests added to the discovery burden on Tesla at that stage of the *Vaughn* case, Tesla's obligation to respond was nothing more than a byproduct of the legislative authorization permitting every employee in the state to make demands for employment information from current or former employers, subject only to the exemptions written into the statutes authorizing such demands. None of these exemptions applies here.[7]

---

[7] The only such exemption Tesla cited below, an exemption it relies on here as well, provides that the right to inspect and receive copies of personnel files pursuant to a Labor Code section 1198.5 request "ceases" during the pendency of employment litigation filed by the requesting employee against the employer. (Lab. Code, § 1198.5, subd. (n).) Tesla's reliance on this exemption rests on the premise that the *Vaughn* case is a lawsuit plaintiffs filed against Tesla. That premise is incorrect. As absent class members, they have no control over the *Vaughn* action, and never did—before or after it was filed. As a general matter, " 'a nonnamed class member . . . "is [not] a party to the class-action litigation before the class is certified" . . . . [Citation.]' " (*Bowser v. Ford Motor Co.* (2022) 78 Cal.App.5th 587, 618, italics omitted; see *Smith v. Bayer Corp.* (2011) 564 U.S. 299, 312–318.) Relying on an exception to this general rule, Tesla argues that "unnamed class members are 'parties' for purposes of discovery" in pre-certification class actions. (*National Solar Equipment Owners' Assn. v. Grumman Corp.* (1991) 235 Cal.App.3d 1273, 1281–1282 (*National Solar*); see *Southern California Edison Co. v. Superior Court* (1972) 7 Cal.3d 832, 840.) But the *Edison/National Solar* line of cases addresses the availability of party discovery tools to defendants seeking to compel information *from* unnamed class members. The rule these cases enunciate—which permits circumscribed party discovery against absent class members in some circumstances (see *Danzig v. Superior Court* (1978) 87 Cal.App.3d 604, 612)—sheds no light on the issue presented here. Certainly, they do not stand for the broad proposition that absent class members may always be treated as parties for all purposes.

16

The bottom line, as we see it, is this. Faced with many requests for information that had nothing to do with the allegations in *Vaughn*, Tesla made no effort to produce anything. This suggests it viewed the *Vaughn* case as a convenient excuse to relieve itself of the burden of meeting statutory obligations that were independent of its *Vaughn* defense. While the position Tesla took in response to these requests incidentally closed the door to plaintiffs' ability to gather evidence supporting their allegations in *Vaughn*, that did not transform the plaintiffs' demands for personnel files under the Labor Code—or Tesla's response to those demands—into petitioning activity "in *Vaughn*."

Accordingly, because the PAGA case does not rest on any "written or oral statement[s] or writing[s]," section 425.16, subdivision (e)(2) does not apply and the *Crossroads* case—which was decided under subdivisions (e)(1) and (e)(2)—is inapposite. Nor is there any merit to Tesla's narrowly articulated backup argument under section 425.16, subdivision (e)(4). Because Tesla fails to identify anything in the PAGA case that implicates speech or petitioning activity undertaken in connection with a public issue under the *FilmOn-Geiser* test, section 425.16, subdivision (e)(4) does not apply either. And in the absence of any protected conduct at step one of the anti-SLAPP analysis, we need not address whether the PAGA case lacks minimal merit. The merits of the PAGA case must be addressed in the usual fashion, by dispositive motion or trial.

17

### III.

The trial court's order denying Tesla's anti-SLAPP motion is affirmed. Costs on appeal shall be awarded to respondents.

STREETER, J.

WE CONCUR:

BROWN, P. J.

HITE, J.[*]

---

[*] Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:    Superior Court of California, County of Alameda

Trial Judge:    Hon. Julia Spain

Counsel:    Reed Smith, Raymond A. Cardozo; Holland & Knight,
        Christina T. Tellado for Defendant and Appellant.

        Nichols Kaster, Matthew C. Helland and Jasjit Mundh;
        California Civil Rights Law Group, Lawrence Organ;
        Bryan Schwartz Law and Bryan Schwartz for Plaintiffs
        and Respondents.